The next case on the calendar is United States v. Gigliotti. Good afternoon, Your Honors. May it please the Court. This is Brendan White on behalf of Gregorio Gigliotti and Angelo Gigliotti. I'd like to address the Batson issue first on behalf of Gregorio Gigliotti. When the prosecution made a belated observation after jury selection was complete and the excused jurors had already left, that the defense challenges had all been used against men. The simplest, most straightforward, and legally correct solution would have been to tell the government that its objection was too late and to seat the selected jury and to move forward with trial. The Court itself immediately noted that the objection had come late, it created a hornet's nest of problems, and it didn't allow for a workable solution. Nevertheless, the Court went against this better judgment and ultimately reseated two jurors, including one where the prosecution did not even object. This was structural error and requires a new trial. Excuse me, Mr. White, you say that the jury selection had been completed, but the selection of alternates hadn't been completed, right? That is correct, although the original 12 jurors had been seated. And so is there any case law that addresses this situation? That is, the cases that I've seen, and I may have missed something, are ones in which the objection was raised after the trial began, in effect, and of course that would be too late. But when the case is referred to after jury selection, the objection has to be made before jury selection is completed, were any of those either distinguishing or deliberately choosing not to distinguish between selection of the first group of jurors and the entirety of jury selection? Well, Your Honor, I did a lot of research in this circuit. I imagine you did, yes. And the circumstances here were unusual and unique. That's obviously a big part of the problem here. As Judge Deering recognized immediately, the same issues that arise under any circumstance where the jurors have already been sent home, where 12 have been seated, where time has elapsed since the challenges were made and suddenly counsel is asked to account for those challenges, they apply regardless of whether the alternates were seated, whether the trial has begun or not. Here we're talking about hours afterwards and a decision that was made two days afterwards in which jurors were asked to return two days afterwards, human nature being what it is, it's all but inevitable that a juror who has been called for a case might do a little investigation on their own. So what was that all about? Was there any evidence or any request for the judge to interrogate those recalled jurors as to whether they'd done any research or looked at any newspapers or anything in the interim? Well, there was a news story which defense counsel brought to the court's attention in which it pointed out, it just created a concern that defense counsel had only challenged men and leading the concern, well, what are the women, what are the female jurors going to think about that? What are the male jurors going to think about that? It just created a mess. I'm sorry, I'm trying to understand exactly what the issue is here. You suggested that there was a problem because the jurors had already been, the potential jurors who later were seated, had already been excused and sent away, and your concern was that they may have read up on the case in the interim. And what I asked you was a pretty simple question. Was there any evidence that they had done that? And if there is none, was there any, is that because there was a request that the judge voir dire those jurors on that and it was denied? No, Your Honor. Okay. Moving on. And then you suggested that maybe there was prejudice because the female jurors were exposed to the fact that there was a Batson challenge because only men had been challenged. Did the judge conduct the discussion of the Batson challenge in front of the other members of the jury panel? No, Your Honor. But as I had noted, there was a story in the news. And yes, we acknowledge that there was no voir dire on the subject. But that concern was an active concern. Well, I'm just trying to understand. You see, if you're making the argument that this was simply improper and the judge had no power to do it or the judge abused his discretion, I understand that argument. But if you shift into saying things like the women jurors were prejudiced or the jurors who were recalled probably did research, this is all speculation, right? There's nothing of that in the record. Well, just to step back for a moment, as Your Honor points out, I am making the argument that this was improper on its face. It violates McCrory. McCrory did cite concerns. And I'm simply noting that those concerns are real here. It's not dependent on those factors. Okay. I understand. Yes, Your Honor. I understand. Thank you. Okay. Moving on to the even more procedurally improper and troubling fact of the decision to receive Juror 16 when the government expressly did not object to the challenge of Juror 16 under Batson jurisprudence. Several courts within the circuit have made clear that the burden of persuasion at all times remains with the objecting party. And several cases have held that where a party did not advance a Batson objection or withdrew a Batson objection, the objections waived. And that's exactly what happened here. The government had time to look at the challenges, determined that there was nothing inappropriate about Juror 16. But again, going back to the court's decision to allow the inquiry to extend over several days, there was a problem. The judge had reached its own conclusion, and it compounded the error in going forward with a Batson inquiry at all by then, instead of just relying on the objections raised by the prosecution, which would have been the correct thing to do, instead the judge decided, well, I've already reached my own conclusion, and I'm going to rely on that even when the government did not object. Finally, with respect to the court's decision to receive those two jurors, the credibility determination itself was incorrect and was clearly erroneous. With respect to Juror 16, the court did not even mention the fact that that juror had a family member who had recently retired from the NYPD, which is always a very common basis for a defense strike. But that factor wasn't raised by defense counsel at the time, right, as the rationale for the strike. That goes back to the original sin in this case, that this all took place well after the challenges had been made and required, as McCrory has said, is inherently problematic. It requires everybody, including the proponent of the strike, to go back and try to rehash in their own minds what they were thinking. It's particularly problematic here, as I pointed out, that when you have a defense challenge, the defendant himself is a party to the challenges and has a very real and well-recognized input into those decisions. It just creates further problems, where now you're not only asking the attorneys, who might be expected to have some basis that they'd be able to articulate regarding the challenge, but now having to go back and examine the defendant himself and his own thought process. It just makes things an enormous mess. And that manifests itself here, Your Honors, in all three of these ways. I submit to you that any one of the three requires reversal here. And the combination just makes the Batson procedure utterly outside of Batson's jurisprudence, completely disregarding the usual protocol and requires a new trial here. Thank you, Mr. White. Of course. I believe I'm now supposed to move forward with Angelo Gigliotti's argument, which relates to the Italian tape recordings. From the very beginning of this case, the defense always had reason to believe that the initial wiretaps had been based on Italian interceptions that had been made at the behest of U.S. law enforcement to circumvent the Fourth Amendment requirements in violation of Maturo. And if that was so, the entire investigation and everything that flowed from it was flawed. At its most basic level, the new information raised in the post-trial motions, especially the information regarding Inspector Moroni of the Italian National Police, shows that the premise of the district court's pre-trial and post-trial rulings was never correct. As Moroni made clear, at the time he received the initial information regarding Gregorio Gigliotti, there was no independent Italian investigation into Gigliotti, Franco Fazio, or anyone else connected to them. In fact, the circumstances and Moroni's statements make it clear that U.S. officials were working closely with Moroni on an existing American investigation called Newbridge, which was related to another older investigation called Oldbridge. And the U.S. law enforcement were investigating Gregorio Gigliotti on their own, although they did not have probable cause to initiate their own wiretaps. So they wanted and needed help from an outside source. From that point on, the U.S. and Italian officials were joined at the hip, with Inspector Moroni actively participating in searches in the United States with U.S. law enforcement and Agent Lamarca testifying at the eventual Italian case. All of this was well known to the government throughout the pendency of the case and warranted at least a hearing as to the genesis of the investigation. But this information was not disclosed to the defense or to the district court. It is important to note that the defense was not even aware of Moroni's existence until after the initial Rule 33 motion had been filed. Although the pretrial rulings of the district court denying a hearing arguably make a little more sense in light of the limited information that was available at the time, the information regarding Inspector Moroni was largely before the district court in the post-trial motions and should have led to a full hearing. But the court essentially just relied on its earlier ruling, while barely even mentioning the existence of Moroni, let alone how his statements undercut the court's earlier rulings and the government's representations. That's contrary to this court's reasoning in GIBO, which noted in the Rule 33 context the importance of establishing a complete record. The defense was deprived of that opportunity here, and our position remains that such a hearing would have shown that Matura was violated. Since the initial wiretaps were the basis for the entire United States investigation, including the U.S. wiretaps and searches, suppression of the initial wiretaps necessarily would have required dismissal of the indictment as a whole. Although we take the position that the circumstances here provide grounds to formally recognize a joint investigation exception under Matura, the circumstances here do fall under the virtual agent standard more than in Matura, Lee, or Ghetto, early decisions of this court. Here, as noted, Moroni and Lamarca worked actively on the American investigation and searches, together with the Italian investigation, and Agent Tarkin participated in arrests in Italy. Notably, neither Matura nor Lamarca were called as witnesses in this case, despite their heavy involvement, presumably because it would have opened them up to cross-examination regarding the investigation. Does the court have any further questions on this issue? Thank you, Mr. White. We'll hear from the government. You've reserved some time for rebuttal. That's correct. Thank you. Thank you, Your Honor. May it please the court, Keith Edelman for the government, and I was trial counsel below. Beginning with the reverse Batson challenge and the defense's claim that the challenge was late, as Judge Lynch noted, the government raised its objection while the alternate jurors were being selected. The primary jurors had not been sworn. They had not even left the courthouse. They were sent downstairs while the jury selection was ongoing, while the alternate jury selection was ongoing. And when the government raised this issue to Judge Deery, he informed the defense counsel that they will need to be prepared to present their facially gender-neutral reasons for these jurors. This, therefore, is far from the case  where a challenge was made months after trial had ended. And there, the court noted the concerns that the defense counsel might, or the government might not be able to recall the reasons for the strike. The court might not be able to have sufficient memory as to the demeanor of the jurors and defense counsel. And, therefore, the challenge must be made before jury selection ends. And here, we submit that jury selection had not ended. No jury had been selected. And, therefore, Judge Deery, as he ultimately said, this was at Gregorio Gigliotti's appendix at 286, he said that this was legally proper and legally timely. As to Judge Deery's decision to seat juror number 16, this argument that Judge Deery did so improperly because the government didn't press the objection, that was not raised at the time to Judge Deery. But, in any event, the government did, in fact, object to all 10 jurors who were men, and the peremptories were used on all men at step one of the Batson analysis. At step two, the defense proffered or tried to proffer gender-neutral reasons. And, so, at that point, Judge Deery had all the facts before him to make a factual determination to which, of course, this court must afford great deference. And, therefore, the government's failure to keep pressing juror number 16 doesn't deprive Judge Deery of the ability to remedy what he determined was a constitutional violation. Indeed, Batson itself is a doctrine that is created to protect the rights of the juror to avoid being discriminated against. And that's what Judge Deery did here. And I also note that to the extent the defense has argued that the jury, and bringing them back two days later was somehow the jury was tainted or there was some improper communication, I will also confirm there was never a request to voir dire the jury as to the newspaper article. And Judge Deery gave a very bland reason as to why there was a switch in the jurors that was actually made at the government's request to try to avoid any suspicion as to why there was a change. And this is at Gregorio Gigliotti's appendix at 318 where he just says that the change was made in consultation. We make our final adjustments to the jury. Turning briefly to the purported matural violation, this is an argument that was raised three times to Judge Deery and three times he rejected it. And that's because there is no evidence that the Italian authorities were the agents or virtual agents of U.S. authorities. There was no evidence of any direction or control and certainly no evidence of any intent to evade constitutional requirements. And that is what is required by this court's precedents in Ghetto and Lee. This is the case where there was, to be sure, information sharing that's appropriate and should be encouraged, not discouraging a case like this. And the defense focuses a lot on the testimony at the Italian trial of Inspector Moroni who testified that he began to focus on the Gigliottis based on information provided by the FBI. But that was also the case in this court's decision in Ghetto where a U.S. inlet to Israel is what prompted the Israeli investigation. They then conducted surveillance and used recording devices. And then that information was then used by U.S. authorities just four months later to indict the defendant in the United States. And that was upheld by this court and there was no hearing needed to go further in that. And here all the facts and circumstances reveal that this was not an agency or virtual agency arrangement. There were arrests, excuse me, indictments of some of the same people. The Gigliottis were indicted in the United States and Italy. No U.S. facilities were used to conduct Italian wiretapping or vice versa. There was no live monitoring of each other's wiretaps as this was going. And the scope of the investigations were different and there was some overlap to be sure and some information sharing. But what is crucially missing is that there is no agency or no direction from the U.S. to the Italian authorities that would require any analysis or suppression under Matura. So I think those three minutes have elapsed, Your Honor. I'm happy to answer questions. Also happy to address the other issues that are raised by the defense. Thank you, Mr. Edelman. We'll take your argument under advisement and we'll ask Mr. White for rebuttal. Thank you, Your Honor. Thank you, Your Honor. With respect to the Batson issue again, I do take issue with my adversary's representation that the government did, in fact, object to Juror 16. As I discussed in my reply brief, it certainly is true that at the time when they first brought the issue to the court's attention, they noted that all men had been stricken. But when they were expressly asked by the court to identify the jurors where they thought there had been, in fact, a Batson violation, they expressly identified four jurors, none of them being Juror 16, and they said they did not have an issue. And my adversary, I'm certainly inviting him to correct me if I'm wrong about this, but they said they did not believe that there was any discriminatory intent with the other jurors, which would have included Juror 16. And did the defense at that point, when the judge nevertheless excused Number 16, did defense counsel object to that on the ground that the government had waived it? They did not, Your Honor, but I maintain under the circumstances plain error analysis would nevertheless require reversal. Okay. With respect to the Italian wiretaps and the Matura violation, you know, we were, I'm certainly not complaining. As a defense attorney, I'm often in the position of being at a disadvantage. And this case was no exception. And of course, I only came into the case at the time of the appeal. But we were presented with a logistical nightmare that made it extremely difficult to bring the Rule 33, Rule 12, B3 motion forward. We did the best we could, but there were many, many pages, which became available to us at various times through the pendency of that motion. I do not speak Italian. My clients speak limited Italian. And from what we were able to put together from this, there was an extensive amount of actual work between these two agencies throughout the entire pendency of the investigation and prosecution. It was not the kind of circumstance in which there were two separate investigations that went on at different times with different targets. The entire genesis of the thing was a communication between somebody in the United States, who I believe was Lamarca, although he never testified, so we can't know it for sure, and Agent Moroni, who was heavily involved in this case. But we were never able to cross-examine either of these people with respect to the nature of the Italian investigation, the nature of the relationship, how it had come about that they got Gregorio's information to begin with and decided to start recording him. Without that, we were hamstrung, the court was hamstrung in being able to accurately decide this information. Yes, it's true. The court did deny this three times. The first two times, the court had very limited information to rely on. The third time, it had a lot more information. I submit there's a lot more out there, but the court had more information. The court, unfortunately, at that point, decided to rely almost entirely on its previous decisions without taking into account anything that we had brought to his attention via Inspector Moroni. And without that, I just do not believe that that decision accurately reflected the circumstances that really occurred here. And at the very least, a hearing at this point should be ordered to go back and truly evaluate the information that came from Inspector Moroni. Thank you very much, Your Honors. Thank you, Mr. White. Thank you both. Well argued on both sides, and we'll take the matter under advisement.